### LONG-BELL LBR. CO. et al. v. PATTERSON et al.

No. 21746. Opinion Filed Nov. 17, 1931.

Hayes, Richardson, Shartel, Gilliland & Jordan (by Eugene Jordan), for petitioners.

J. Berry King, Atty. Gen., and Robert D. Crowe, Asst. Atty. Gen., for respondents.

KORNEGAY, J. This is an original proceeding to review an award of the Industrial Commission. There appears in the record the employer's first notice of injury, received by the State Industrial Commission on March 28, 1929, showing that the accident occurred on the 25th of March, 1929, and that the claimant was a yard laborer, handling lumber, and had worked at day labor off and on for the last three years at $3 daily. In describing the accident, it stated:

"Claimant was repiling lumber in shed in upper bins and a board broke and let him fall. He fell about eight feet. Cut his head, injured his neck, chest and one foot."

Dr. O. C. Newman, of Shattuck, Okla., was the physician.

On the 27th of April, 1929, the employee's first notice of injury and claim for compensation was received. In giving the cause of the accident and the extent of the injury, he says:

"Boards broke causing me to fall head first from upper platform of lumber sheds head first, cutting gash on scalp, breaking three ribs, and two toes, mashing another, brusing and straining neck badly and leaving back sore and weak."

In response to the likelihood of disability continuing beyond five days, he says:

"Yes, I have been for 30 days and am just barely able to walk—back and breast very sore yet."

He states that his average daily wage was $3, and wages were contracted to be paid daily.

There was a report filed April 20, 1929, of initial payment of compensation, in which the amount of first payment is given at $34.62 from March 30, 1929, to April 20, 1929, and the average daily wage was $3 and weekly rate of compensation was $11.54, and the nature and extent of the injury was: "Injury to head, neck, chest, and foot."

On the 4th of May, 1929, there was received the attending physician's report. It reported that the employee was removed to the hospital at Shattuck, Okla., and the nature and extent of the injury was: "6—7 & 8 rib on left side fractured—cut on upper & left side of head 2½ in. long—large toe & 2nd toe fractured on right foot."

The treatment was: "Immobilized ribs—placed in bed."

In describing the progress, it said: "Gradually improving—able to walk but not able to work."

In giving an estimate as to the time disability was likely to exist, he says: "May 1 to 15, 1929, 8 weeks."

In describing the accident in the party's words he says: "Removing lumber and board broke & he fell to ground distance of 8 feet; after treating at hospital he was removed to his home & for reason no vacant bed at hospital."

The date of this report is May 2, 1929.

On the 6th of January, 1930, the State Industrial Commission received a copy of a notice to the claimant, Patterson, of the suspension of compensation, and showing that the last evidence of payment was the 30th of December, 1929, and compensation was paid to the 21st of January, 1930, and the reason that payment was stopped was given as follows:

"That Dr. Von Wedel's opinion is that this claimant is now able to do ordinary manual labor. We wish to further show that compensation has been paid to January 21, 1930, more than two weeks from the date of filing this motion."

At the bottom, the request was made as follows:

"Wherefore, we respectfully request that claimant submit to medical examination. This cause be set down for hearing.

"(Signed) Long Bell Lumber Company, Respondent.

"Consolidated Underwriters, Ins. Carriers.

"Dated this 30th day of December, 1929, H. O. Roberts, Atty."

The next matter appearing in the record is a notice of hearing, filed the 6th of June, 1930, stating that the purpose was "to determine liability and extent of disability, also disfigurement."

The time for hearing was June 23, 1930, at 9 o'clock a. m., and the place was the county court room at Woodward, Okla. In that notice was a requirement of notifying the Commission if there were any witnesses that were desired to be subpoenaed.

The next thing appearing is the testimony taken on the 23rd of June, 1931, before Chairman Thos. H. Doyle. The record shows the appearance by the claimant in person and through his attorney, C. B. Leedy, and that the respondent and insurance carrier appeared by Eugene Jordan, and both parties announced ready for trial.

The claimant, Patterson, was the first witness introduced, and he described the circumstances attending the accident, and said:

"I fell backwards striking my head and cutting a gash down this way (indicates), broke three ribs and hurt my back."

He claimed that he had two toes broken, and mashed one and jarred his spine. In describing the injury as developed when he got to the hospital, he says:

"I had these fractures here in the toes and ribs and my neck and my head was so I couldn't move it, two or three days, from the time they got it bandaged up there I was in great misery and pain in the center of my spine and back in here (indicates) felt like something was crushed there all the time, it seemed like every breath brought unbearable pain."

In response to a question as to whether prior to this time he had ever been injured in the back, he says: "No, sir; my back never did bother me."

He details his condition as follows:

"Q. What was the nature of your employment prior to this injury? A. I'd been in the grocery business most all my life, general store, many times I would carry up a 150 pounds of flour. I was able to handle anything; at the time, I was working at the lumber yard carrying 100-pound sacks of cement. Q. Were you ever bothered before prior to this injury to your back? A. I suppose sometimes my back did get sore, especially an old man might be bothered, it wouldn't disable me in any way."

He detailed how the Long-Bell Lumber Company had given him medical attention and allowed him compensation from the time of the injury to the 21st of January, 1930, and that his wages were $3 a day, or $18 a week. He detailed his condition as a "weakened condition of the spine, so I couldn't stand anything, I tried and couldn't."

He claimed that he had pain continuously since, but had done light work, and that when he was at Oklahoma City, Dr. Von Wedel and Mr. Roberts insisted that he do something, and that he assisted his neighbor in shingling his house, but could not do any lifting and could not walk around on the roof. He was not able to move for three or four days.

The suggestion was made to him that he felt weak following that, and he answered "Yes," and in further describing his work, questioned by his attorney, he used the following language:

"Q. Have you tried to work any more? A. I stayed at Mr. Young's store at different times, he knows my condition, he leaves the store to me when he arranges everything so I won't have to lift anything; the heaviest thing I have lifted was a 25 pounds of nails, if I only had one or two customers at a time I would get along nicely, I could rest my back and sit down and rest, if I happened to have four or five I simply couldn't stand up till I got through with them. Q. How many days have you worked for him since you were injured? A. I think I probably all told worked ten or twelve days for the past year and a half, maybe, a little more than that, the first of the month I do his collecting for him, I do that, of course, whenever I feel like it, on the way I can sit down and rest. Q. Have you any special trade to follow? A. No, sir. Q. Just common labor? A. Yes, sir; that's all I am capable of doing. Q. Since your injury have you been able to perform that at all? A. No, sir. Q. What is your condition towards doing a day's work? A. No, sir; I just couldn't possibly do it. Q. Where is the seat of the pain? A. I don't know I can tell you, I can show you. Q. What part of the body? A. It is right in the center of the back in here. Q. What the doctor describes as the 11th and 12th lumbar vertebrae? A. Yes, sir. Q. Has the pain been there all the time since the injury? A. Yes, sir; all the time. Q. Have you observed any curvature of the back so you couldn't stoop over? A. Yes sir; I can't stoop like I did. Q. Can you stoop over and lift any weight? A. Not to speak of, 25 pounds is all, if I lift more I exert myself too much,

I might possibly lift 50 pounds, I feel it when I lift 25 pounds, I was always afraid of making it worse."

Further on we find the following:

"Q. Do you know in your conversation why Doctor Newman is not here? Mr. Jordan: Objected to as hearsay. Judge Doyle: Overruled. Mr. Jordan: Exception, please. Judge Doyle: Exception allowed. A. He said he had a major operation this morning he had to take care of. Mr. Leedy: If the court please, it is impossible to get Doctor Newman here before 3 or 4 o'clock this afternoon. Judge Doyle: I will set this case at Shattuck; you are claiming total disability? Mr. Leedy: Yes, sir, permanent total disability. Q. Have you recently, Mr. Patterson, tried to work and do manual labor? A. I did a little around my house, I got down on my hands and knees and pulled the weeds out of the grass, I didn't perform any manual labor, I did the other day dig up a patch of dirt. Q. How long did you work at a time, can you work ten hours? A. I can't work at it two hours. Q. What would be the effect if you worked two hours? A. I would be tired out. Q. The day you helped Mr. Wilkens shingle, how many days did you do that? A. Three days. Q. That night what was your condition? A. I didn't sleep hardly any at all, I suffered pain in my back."

It developed that years ago he had his collar bone broken from being dragged, and his back was skinned. He further stated that all of his injuries had healed and that the only claim now was injury to the back. He was cross-examined by the attorney for the employer and it developed that he had had other employment, and that he averaged three days' work for the lumber company during the time he was working for them, and that he stayed at the store and waited on the customers since the injury, and that before the accident he was doing all kinds of work and carrying nails and flipped them upon the rack, but that now Mr. Young kept the store so that he would not have anything to lift. It developed that he had spent two weeks taking the census, and had realized $70 or $80 but had to pay somebody to drive him, and that he had carried a sack of flour, weighing 48 pounds, from the store to his home, a little over a block, and he worked in his garden using a hoe and shovel.

He stated to the Commission that the stiffness in his neck continued three or four days, and the following is the language of the Commission's examination, found on page 24:

"Q. You had a neck injury? A. I strained it. Q. None of these doctors who treated you claim a fracture to the cervical vertebrae? A. No, sir. Q. How long did your stiff neck continue? A. Three or four days.

Q. Any contusion or abrasions on your head? A. Yes, sir. Q. Did it leave a scar there? A. I expect it did. Q. Leave a ridge there where you put your hand? A. No, sir; seems to be nicely healed."

It developed in the Commission's examination that they did not put him in a case, but taped him, but did not tape anything but his ribs. After the Commission finished, he was cross-examined by Mr. Jordan, who asked him how much he had earned since the injury, and his reply was:

"A. I don't know, of course, I didn't collect the first month or two after injury, must have been about 14 months, somewhere in the neighborhood of $33 to $36, something like that. He paid me $36. Q. You started to collect two or three months after the injury? A. Yes, sir. Q. Been doing that every month since? A. Yes, sir. Q. You collect along the first of the month and get all the bills in? A. Yes, sir."

It developed that his examinations had been in the Von Wedel clinic. At the request of Mr. Jordan, he detailed something of the examinations and the X-raying in the hospital. He was then examined by the Commission as to his working one day in the collecting business each month. He was again cross-examined, and in that cross-examination it was stated that the first discovery of injury to his back was made by Dr. Von Wedel. That Dr. Newman did nothing for his back.

Besides the claimant, his employer in the store testified that before the accident the claimant was a stout, healthy man, and worked in a store eight years steady and never complained of any hurt in his back, but that since he came back he did not ask him to do the work he did before. He also stated that he was not a physician and could not examine him and tell what was wrong. The witness, being examined by the Commission, testified as follows:

"Q. Did you ever notice any indication that he was not an able-bodied man up to this accident? A. No, sir. Q. You don't think he is a malingerer? A. He don't stand straight. Q. That has been his usual and customary manner of moving around since this injury? A. Yes, sir. Q. Before the accident he walked straight? A. Before then he could lift and bend and lift a nail keg. Q. If he had any disability of any kind before this accident it was not called to your attention? A. No, sir."

Mr. Wilcox, a farmer and a neighbor, detailed the work of shingling his house and that the claimant never stayed on as many hours as the others did and did not do as much work, and his attorney developed from this witness that Mr. Patterson was known in his community as being one of the best

citizens, and this was objected to, but no ruling on it. It developed that Mr. Patterson had two farms.

Mr. Prather, another neighbor, testifying for claimant, had known him for 24 years, and never knew of his complaining or refraining from doing hard labor, but since the injury he had not known of his doing hard work. He was cross-examined and stated he could not tell how often he went out to his farms, and that he did collecting every month and that he was doing light work. He was examined by the Commission as follows:

"Judge Doyle: Q. You have known him 24 years? A. Yes, sir. Q. Intimately? A. Yes, sir. Q. Neighbors? A. Yes. Q. Lived there together? A. Yes, sir. Q. Have you had an opportunity to observe him every week? A. Yes, sir. Q. He was an able-bodied man in every respect? A. Yes, sir. Q. If he possessed any disability up to the time of the injury, you didn't know it? A. No, sir. Q. Since the accident, what would you say his condition was now? A. I don't think he could do a day's work. Q. Has he always walked since this accident in the manner he does now around this court room? A. Yes, sir. Q. You see him every week? A. Yes, sir. Q. Every day? A. Yes, sir. Q. He has always been in this disabled condition as he appears to-day since the accident? A. Yes, sir."

The claimant was recalled for further examination and was examined by the attorney for the carrier. He stated that he owned two farms, and he went out once in a while, and he had tenants on each. At this time the attorney for the claimant gave notice of a desire to take the testimony of Dr. Frost of Wichita for the purpose of showing the depression of the eleventh and twelfth vertebrae of the lumbar region of the back, showing the curvature of the spine caused by the injury and the compressed condition of the anterior part of his vertebrae, and also the deposition of Dr. O. C. Newman, the radiogram and X-ray expert of Shattuck, who had taken X-rays of the injury of Mr. Patterson for the purpose of showing the compressed condition of the vertebrae and the cause of the injury, and asked the court to set a date to take the deposition and the cost of the deposition be taxed to the carrier.

Attorney for the other side stated that there was no objection to taking the depositions on behalf of the claimant, but did object to the expense of getting Dr. Frost's testimony being taxed to the carrier, as he was outside of the state of Oklahoma and the examination was made without their knowledge or consent. The attorney for the claimant stated that they desired to take deposition of Dr. Heatly of Oklahoma City. The Commissioner stated it was not necessary to take deposition at Oklahoma City, as the Commission was always in session there.

Thereupon the order of the Commission was made that the motion to suspend compensation be overruled, and denied, and that they should continue paying compensation until the further order of the Commission. The attorney for the carrier requested the Commission to continue the cause for the purpose of taking the testimony of Dr. Curt Von Wedel, Dr. Schulter, and Dr. Riley, and urged that there was no evidence in the record to justify an award for compensation, and no finding of loss of earning capacity, and objected to the denial of the motion to suspend. The reply of the Commission was as follows:

"Judge Doyle: You have been given that opportunity and stated you would not be able to proceed." (T. 44.)

That appears to be the last thing in the way of taking depositions or proof that was had. There appears in the record, at page 46, an answer of the respondent and insurance carrier, received on the 18th of June, 1930. It contained a statement of the payments that had been made and a denial of temporary total disability after January 21, 1930, and set up that the claimant had been able to and had earned wages in other employments, and especially pleading section 7290, C. O. S. 1921, subdivision 3, subtitle "Other Cases." There was a denial of the employee's sustaining serious or permanent disfigurement to the face, head, or hands. Next appearing is a report to the Consolidated Underwriters by the Von Wedel Clinic, received January 30, 1930, by the Commission, and giving the history of the injury, and a recommendation that the claimant go to work. The next thing is the order of the 25th of August, 1930, here complained of, which is as follows:

"Now, on this 25th day of August, 1930, the State Industrial Commission being regularly in session, this cause comes on pursuant to a hearing had at Woodward, Okla., June 23, 1930, before Chairman Thos. H. Doyle, to determine liability and extent of disability and also disfigurement, the claimant appeared in person and by his attorney, C. B. Leedy, and the respondent and insurance carrier by Eugene Jordan, the Commission having examined all the evidence, the records on file and being otherwise well and sufficiently advised in the premises, finds the following facts:

"1. That on the 25th day of March, 1929, the claimant, J. W. Patterson, was in the employment of said respondent and engaged

in a hazardous occupation subject to and covered by the provisions of the Workmen's Compensation Law, and that on said date said claimant sustained an accidental injury, arising out of and in course of his employment, consisting of injuries to head, neck, chest, and foot.

"2. That the claimant's average daily wage at the time of said accidental injury was $3 a day.

"3. That by reason of said accidental injury, the claimant has been temporarily totally disabled from the performance of his ordinary manual labor from the date of said accident on March 25th to this time, August 25, 1930, and at this time he is temporarily totally disabled from the performance of his ordinary manual labor.

"4. That the claimant has heretofore been paid compensation for a total of 42 weeks and three days at the rate of $11.54 a week, or a total sum of $490.45, computed from March 25, 1929, to January 21, 1930.

"Upon consideration of the foregoing facts the Commission is of opinion that the claimant is now entitled to compensation from January 21, 1930, to August 25, or for a total of 30 weeks and five days, at the rate of $11.54 a week, or the total of $355.82, and that said compensation at the rate of $11.54 a week should continue from the 25th day of August, 1930, until otherwise ordered by the Commission.

"It is therefore ordered: That within ten days from this date the respondent or insurance carrier pay to the claimant the sum of $355.82, as compensation from January 21, 1930, to August 25, 1930, or 30 weeks and five days at the rate of $11.54 a week, and that said compensation at the rate of $11.54 a week shall be paid by the respondent or insurance carrier to claimant until otherwise ordered by the Commission, and that the respondent or insurance carrier shall pay all doctor, medical, and hospital bills incurred by reason of said accidental injury.

"It is further ordered that within 30 days from this date, the respondent or insurance arrier file with the Commission proper receipt or other report, evidencing compliance with the terms of this order."

This order is complained of by the petitioners because of its being made in the manner it was made, and also because they were not permitted to have a hearing that would entitle them to due process of law, and also because the Commission was in error in making the award for total disability without deduction for earning capacity. We are convinced from an examination of this record that the award was prematurely made and that both sides were entitled to an opportunity to introduce more evidence than was adduced before the Commission. Both sides had asked for such opportunity. The injury complained of, and its effect, undoubtedly was a matter warranting a thorough investigation by men trained in such work. Nothing on the outside, at the time of making the award, aside from the walk or carriage of the man, indicated the injury. The necessity in this case for the help of some person with knowledge of the situation is clearly developed in the course of the examination, with reference to the "eleventh and twelfth lumbar vertebrae." Dorland's American Illustrated Medical Dictionary describes the human vertebrae as follows:

"The vertebrae comprise seven cervical, twelve dorsal, five lumbar, five sacral, and four coccygeal."

The Workmen's Compensation Law, as it appears from reading it, was designed to expedite hearings, unhampered by technicalities, and the rendering of relief when relief was most needed. The technical rules of court trials, of course, should not be insisted upon, when they come in the way of the general policy of the law, as shown by these acts. However, the great fundamental principles that are guaranteed by the Constitution, of a trial that is without prejudice, are applicable to hearings before the Industrial Commission. The Commission should be informed in each case before they make orders, permanent in character, as was this one, and requiring property to be taken from one man and turned to another. It matters not which side is to be the gainer, the law requires that a reasonable opportunity to be heard and to produce evidence to establish the truth of the allegations be given.

Evidently, in this case, from the examination, a good deal of the testimony was elicited as a result of suggestion, sometimes at the instance of the attorney, sometimes at the instance of the Commission. The record shows the Commission searching for a scar, which the injured party did not appreciate, though by virtue of contact with himself, he should have been the first to discover it. The finding of injury in this case failed to mention a back injury, which was practically the sole ground of complaint.

Apparently the carrier in this case was trying to do something for the injured workman and the injured workman himself was trying to do something, as it developed that he had about as steady employment after the injury as he did before, but he could not lift as much. In this case, it developed that he had carried a 48-pound sack of flour for over a city block when he desired so to do, and apparently without its hurting him.

We think that in this case, under the admitted facts, the award should not have

been for total disability, as all concede that the claimant actually was able to do, and actually did, other work after the compensation was discontinued. Evidently this case, under the admitted facts, comes under the 3rd subdivision of C. O. S. 1921, section 7290, as amended by Session Laws of 1923, c. 61, sec. 6, under the heading "Other Cases." See Otis Elevator Co. v. Haveley, 148 Okla. 82, 296 P. 1106. It further is one of those cases that would require the investigation to be made by men who are familiar with anatomy and pathology, as distinguished from ordinary laymen, in order t) determine the disability, if any, and also to throw light upon the connection between the injury and the disability.

It would seem that authority is not required on the necessity of allowing parties an opportunity to present their evidence, aside from the recital of the proceedings. In the case of Forrester v. Marland, 142 Okla. 193, 286 P. 302, this court vacated an award in which the claimant was not given an opportunity to present his evidence. Apparently neither side was given the opportunity here, and the Industrial Commission evidently overlooked the state of the record.

The award should be vacated, and the matter remanded to the Industrial Commission for the purpose of having a hearing at which both sides are given a reasonable opportunity to present their testimony, and after hearing it to make such an award as justice may require, and according to the principles indicated in this opinion.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, CULLISON, SWINDALL, and McNEILL, JJ., concur. ANDREWS, J., absent.